**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | ) | |
| | ) | |
| **6 CELLULAR PHONES CURRENTLY** | ) | **Mag. No.** |
| **LOCATED AT 601 4TH STREET, N.W** | ) | |
| **WASHINGTON, D.C.** | ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS FOR CERTAIN CELLULAR PHONES

I, Christine M. Roe, Special Agent with the Federal Bureau of Investigation, Washington, D.C., (hereinafter the "affiant") being duly sworn, state the following:

## INTRODUCTION

1. I am a duly appointed Special Agent of the Federal Bureau of Investigation (FBI) and have been employed as such since August, 2014 I am currently assigned to squad CR-3 at the Washington Field Office (WFO). Squad CR-3 is responsible for conducting investigations that target International Drug Trafficking Organizations. Since January of 2015, I have been working on federal narcotics investigations and have participated in several investigations which led to the arrest and conviction of narcotics distributors. Since 2014, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing

telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

2. Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal agents and police officer who are knowledgeable of drug-trafficking organizations, your affiant knows that:

a. Those involved in narcotics distribution often use cellular telephones or other electronic devices to facilitate the planning and execution of the criminal activities;

b. Those involved in narcotics distribution take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their products, including with cellular telephones;

c. Those involved in narcotics distribution often keep address and/or telephone books, reflecting names, addresses, telephone numbers, page numbers, fax numbers, and/or telex numbers, including computerized or electronic address and telephone records, of their associates, and these address or telephone books can often be found on their cellular telephones or other electronic devices;

d. Those involved in narcotics distribution sometimes keep their cellular telephones or other electronic devices, calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to their criminal activities;

e. Electronic devices can store information for long periods of time; even when a user deletes information from a device, it can sometimes be recovered with forensics tools.

**TERMS RELATED TO CELLULAR PHONE SEARCHES**

3. The following terms have the indicated meaning in this Affidavit: A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending receiving, and storing text messages and email; talking sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include global positioning system ("GPS") technology for the determining the location of the device.

**INVESTIGATION**

4. On or about November 1, 2016, the grand jury returned an indictment charging MARVIN CARPENTER, VERNON RUSSELL, JR., RONALD HUNT, and another individual with conspiracy to distribute narcotics in violation of 21 U.S.C. Sections 846 and 841(b)(1)(B)(i), distribution of heroin in violation of 21 U.S.C. Section 21 U.S.C. Section 841(b)(1)(C), and related offenses. This case arises from an investigation into narcotics trafficking in the Washington, D.C. area. In particular, beginning in June of 2015, the FBI began to make a series of controlled purchases of heroin from defendant RUSSELL. Using a cooperating witness (CW-1), the FBI bought approximately one ounce of heroin (28 grams) at a time and, ultimately, purchased

approximately 140 grams of heroin in total from defendant RUSSELL. Each of these purchases was set up by CW-1 calling RUSSELL on RUSSELL's cellular phone. The investigation showed that CARPENTER supplied RUSSELL with heroin, and that he conspired with HUNT to distribute narcotics. Your affiant respectfully submits this affidavit in support of an application for warrants to search six cellular telephones (collectively, the "target devices") lawfully seized during the arrests of the CARPENTER (three cellular telephones), RUSSELL (one cellular telephone), and HUNT (two cellular telephones).

5. As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI and officers of the MPD who are involved in this investigation, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probably cause to believe that located on the target devices are fruits, evidence, and instrumentalities of violation of the offenses charged in the indictment.

6. This affidavit is based, in part upon information provided to me by other Special Agents of the FBI, officers from the Washington, D.C., Metropolitan Police Department (MPD), court-authorized interception of wire and electronic communications, information provided by cooperating individuals, controlled purchases of illegal drugs, seizures of illegal drugs, physical surveillance, and other information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of securing authorization for the search of the target devices, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the search warrants requested herein.

**INTERCEPTED CALLS**

7. During the investigation, the Government obtained authority to intercept communications over the telephones used by defendant CARPENTER and defendant HUNT. There were numerous drug related calls and text messages. For example, on May 3, 2015, at 17:59 (Session 51), CARPENTER received a call from a co-conspirator. The caller asked, "You know the stuff I like?" CARPENTER responded, "Yeah." The caller then said, "Undone, not done, undone." CARPENTER again responded, "Yeah." The caller said, "Now look I'm on 31st Street… but I want four of them. How much for four of them?" CARPENTR replied, "Four will be 57." The caller replied, "That's kind of high man." CARPENTER said that "it" is "Grade A," and can be returned if necessary. The caller indicated that he would check with someone and then call back. At trial, an expert witness will testify that the two were discussing cocaine, and CARPENTER was saying that he could sell approximately 125 grams of cocaine for $5,700. Later that same day, in a series of calls, it became clear that CARPENTER directed the caller to defendant HUNT. CARPENTER sent the caller HUNT's phone number, told the caller where to find HUNT, and vouched for HUNT. HUNT later called CARPENTER and indicated that the deal had been completed.

8. On May 9, 2016, at approximately 4:55 p.m. (Session 393), CARPENTER received a call from a female. After CARPENTER answered, she said, "We need some drugs out here." CARPENTER laughed and asked where she was. She replied that she was at "11th and H." She continued and said there was a mob of people, but there wasn't anything out there. CARPENTER indicated he would be there and ended the call. In a later call, Session 395, CARPENTER called back and asked what numbers she was "working with." She replied, "20." CARPENTER said that he was about to "pull up," and the two ended the call. At trial, an expert witness would testify that the caller appears to sell heroin for CARPENTER on a regular basis.

She apparently thought she could speak very freely on the phone and CARPENTER called back to see how many customers she had to serve.

9. On May 5, 2016, at approximately 1:30 p.m. (Session 168), CARPENTER received a call from RUSSELL. The two discussed where they each were and how long it would take to get together. CARPENTER asked what the "urgency" was. RUSSELL responded by saying, "I would really like it like you get it . . . not like when you got it from the Gardens, but the other one." He continued and said, "Like the hair cut one . . . she was nice." RUSSELL then indicated that he had the "paperwork" in the car. Thus, it seems that RUSSELL preferred narcotics (heroin most likely) similar to the narcotics he had received from CARPENTER at a barbershop over the narcotics he received from CARPENTER at the Potomac Gardens housing complex (where HUNT deals).

10. The Government also received authority to intercept communications over a phone used by defendant HUNT. These interceptions show that HUNT was regularly distributing cocaine, heroin, and marijuana from Potomac Gardens. He often used runners, but he sometimes dealt to customers himself. Many of HUNT's communications were blatantly drug related. For example, on July 20, 2016 (Session 2201), HUNT called one of his runners and asked, "Got a white boy right outside the gate, right?" An unidentified male said, "Yeah." HUNT replied, "Give him three 20s for $50." July 21, 2016 (Session 2475), he sent a text message that read, "I can go 90 a g for you" to a customer. On July 22, 2016 (Session 2646), another customer reported that one-time HUNT had "shit that tingles." Finally, on July 29, 2016 (Session 4392), a customer who was meeting with HUNT said he wanted HUNT to bring his scale with him.

**SEIZURE OF THE TARGET DEVICES**

11. During the course of the investigation, CARPENTER was believed to have used multiple telephone numbers, based on subscriber information, voice comparison, surveillance, and information from a source. On November 1, 2016, after being indicted, an arrest warrant was issued for CARPENTER, RUSSELL, and HUNT.

12. On November 2, 2016, CARPENTER was arrested in the 1000 block of 6th Street Northeast, Washington, DC. Located on his person was an Apple iPhone S Cellular Telephone Model A1688. CARPENTER was standing near a blue Mercedes SUV which had been used in at least one of the controlled purchases of heroin from RUSSELL. Officers saw a bag with suspected heroin in plain view of the vehicle. During a search incident to arrest of the aforementioned Mercedes, officers located heroin and a Samsung, Galaxy Note II Cellular Telephone, as well as a Virgin Mobile Black LG Cellular Telephone.

13. On November 4, 2016, HUNT was arrested after he arrived at his residence 6233 E Hil Mar Circle, District Heights, Maryland driving a gray Dodge Charger. Located on his person was a black LG Cellular Phone. Located in the center console of the gray Dodge Charger was a black Huawei Cellular Telephone.

14. On November 7, 2016, RUSSELL was arrested at the Addison Road Metro Station, 100 Addison Road, District Heights, Maryland. Located on his person was a blue LG Cellular phone with cracked screen.

15. All the above target devices were seized and are currently in the lawful possession of the FBI. The target devices were seized during searches incident to arrest and then promptly stored and maintained in storage in the Evidence Control Room at the FBI office in Washington, DC, a location within the District of Columbia. In my training and experience, I know that the

target devices have been stored in a manner in which the contents of the target devices are, to the extent material to this investigation, in substantially the same state as they were when the target devices first came into the possession of the FBI.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

16. Attachment A describes the target devices to be searched. Attachment B describes the evidence to be seized from the target devices. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct manual searches through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode, communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to thing described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI and its agents intend to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B. All statements made in Attachments A and B are adopted into the body of this Affidavit as if fully set forth herein.

17. Analyzing the contents of mobile devices or telephones can be very labor intensive and also require special technical skills, equipment, and software. The large and ever increasing number and variety of available mobile decide applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel

forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric pass code. Newer cell phones employ equally sophisticated encryption along with alpha-numeric pass codes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide IT Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

18. Based on all of the foregoing, your affiant respectfully submits that searching the target devices pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitable result in over or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

## CONCLUSION

19. Based on the facts outlined above, I submit there is probable cause to believe CARPENTER, RUSSELL, HUNT and others are involved in an ongoing conspiracy to distribute and possess with intent to distribute cocaine and heroin. Further, based upon these facts, there is probable cause to believe the target devices, further described in **Attachment A** contain evidence and instrumentalities of the crimes of the conspiracy to distribute and possess with intent to distribute, and distribution and possession with intent to distribute, illegal narcotics, as more particularly set forth in **Attachment B** attached hereto.

___________________________
Christine M. Roe
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this ________ day of November, 2016

___________________________
Hon. Deborah A. Robinson
United States Magistrate Judge